**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RICHARD PHELPS, #364064, SID #2134897      *

Plaintiff                                                           *

v                                                                      *                    Civil Action No. ELH-16-2675

WEXFORD HEALTH SOURCES, INC.            *
DR. ROBUSTIANO BARREA,
DR. MAHBOOB ASHRAF,                            *

Defendants                                                     *

******

**MEMORANDUM OPINION**

Richard Phelps is an inmate incarcerated at the North Branch Correctional Institution

("NBCI") in Cumberland, Maryland.  On July 25, 2016, he filed a Complaint (ECF 1), pursuant

to 42 U.S.C. §1983, against Wexford Health Sources, Inc. ("Wexford"), Dr. Robustiano Barrera,

and Dr. Mahboob Ashraf (collectively, the "Medical Defendants").[1]  Phelps alleges that he is

receiving inadequate medical treatment because he has not been provided Harvoni,[2] a medication

to treat his Hepatitis C ("HCV").  *Id.*  He seeks $100,000 in compensatory damages and

$100,000 in punitive damages.  *Id.* at 3.  Phelps also filed a motion for injunctive relief to compel

immediate treatment with Harvoni.  ECF 2.

---

[1]   Defendant actually sued "Wexford Health Resources Inc.", "Dr. Barea" and "Dr. Ashraft."  The Clerk shall correct the corporate defendant's name to Wexford Health Sources, Inc.  *See* ECF 15 at 1, n. 1.  Although the Complaint does not include the first names of the individual defendants, the first names were provided in the Medical Defendants' dispositive motion.  ECF 15.  The Clerk shall add the first names.  In addition, the Clerk shall change  the spelling of the surname from Ashraft to Ashraf.  *See* ECF 15 at 1.

[2] Harvoni is a medicine used to treat HCV and contains a combination of ledipasvir and sofosbuvir. Ledipasvir and sofosbuvir are antiviral medications that prevent HCV cells from multiplying in the body. *See Smith v. Corizon, Inc.,* Civil Action No. JFM-15-743, 2015 WL9274915 n. 8 (citing http://www.drugs. com/harvoni.html).

Because Phelps's  Complaint and his motion for injunctive relief raised concerns about his health and safety, on July 26, 2016, I directed the Office of the Attorney General (hereinafter, the "State") to show cause why emergency relief should not be granted. ECF 3.[3]  On August 16 2016, the State filed a response (ECF 5, "Response"), with exhibits, including the Affidavit of defendant Robustiano Barrera, M.D (ECF 5-1), who is the medical director at NBCI, and over 75 pages of medical records for Phelps, provided by defendant Wexford.  ECF 5-2.  The State indicated that Phelps is regularly monitored for HCV, is asymptomatic with an undetectable viral load,[4] and is being appropriately treated.  *See* ECF 5-1 (Affidavit of Dr. Barrera) and ECF 5-2 (medical records).  The response also alleged that Phelps has raised no complaints about his treatment to medical providers.  ECF 5; ECF 5-1.

On August 17, 2016, I notified Phelps that I intended to treat the State's response as a motion for summary judgment, and granted plaintiff time to respond.  ECF 6.  Pursuant to the

---

[3] I directed the State to respond because Phelps is in the custody of the Department of Public Safety and Correctional Services.

[4] Although the term "viral load" is not explained here, I take judicial notice of Dr. Barrera's Declaration, filed in *Insely v. Graham,* Civil Action No. ELH-16-1220 (D. Md.), ECF 13-6 at 6, 2016 WL 7157419 (December 8, 2016).  *See*  Fed. R. Evid. 201(b)(2); *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990).  Dr. Barrera explained:

> A  "viral load" is a measurement of the RNA virus, which is the building block of HCV, in the blood. Being "hepatitis C positive" means the patient has anti-HCV antibodies in the blood. Having HCV antibodies just means the patient has been exposed to the hepatitis C virus.  A person may be antibody positive and have no measurable viral load.  One thing this might mean is that the patient is one of  the nearly 20% of people who naturally clear the virus from their bodies.  The other possibility is that the virus, during the time blood is drawn, was only temporarily undetectable. HCV viral load in the blood goes up and down, and the test might have caught it on a downswing. So before a negative viral load is reported, a second test is indicated. After HCV, people still have antibodies to HCV. But if they have no detectable HCV viral load, that indicates recovery from infection that is, response to treatment and sustained remission. Over a period of time, if a later viral load test comes back undetectable, that patient is in remission.

dictates of *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975), Phelps was also informed that he was entitled to file an opposition to the Motion.   ECF 7.   Phelps replied by filing his own motion for summary judgment on September 2, 2016.   ECF 8.   Thereafter, on November 7, 2016, Wexford, Dr. Ashraf, and Dr. Barrera jointly filed a motion to dismiss or, in the alternative, for summary judgment (ECF 15, "Motion"), supported by a memorandum.   ECF 15-3.   In the memorandum, the Medical Defendants adopted and incorporated the State's Response and its exhibits.   *Id.* at 2.

On the same date, Phelps was notified that he was entitled to file a response in opposition.   ECF 16.   He has not done so.   However, I shall construe his summary judgment motion (ECF 8) as both a motion and as an opposition to the Medical Defendants' Motion.

The matter is briefed and ready for disposition.   No hearing is necessary to resolve the issues.   *See* Local Rule 105.6 (D. Md. 2016).   For reasons to follow, I shall deny Phelps's motion for emergency injunctive relief and his motion for summary judgment.   And, I will construe the Medical Defendants' Motion as one for summary judgment and grant it.

## I.     Factual Background

Phelps was diagnosed in 2013 with HCV.   ECF 1.   He complains that he is not prescribed Harvoni, which cures the condition "almost 100%."   ECF 1 at 5.[5]   Phelps states that on May 24, 2016, he met with "medical representatives" concerning his request for Harvoni.   Phelps informed them that he still feels the effects of the HCV virus.   *Id*. at 5-6.   According to Phelps, he was informed that his "levels" were low, he had no viral load or genotype detectable in his blood, and was among the 20% of persons whose antibodies are able to kill the virus.   *Id*.

---

[5]   I have used the page pagination as it appears on the electronic docket.

In his Affidavit, Dr. Barrera attests that Phelps is seen regularly by prison medical providers as a chronic care inmate for his HCV.  ECF 5-1 ¶5.  Medical personnel monitor Phelps's blood work and regularly check him for symptoms.  *Id*.  Barrera attests that, aside from an acute HCV episode in January of 2013, when Phelps complained of nausea and jaundice, which was determined to be related to illicit drug use, Phelps has been "entirely asymptomatic with an undetectable viral load."  *Id*.

Further, Barrera attests that HCV symptoms vary depending on the cause of the illness and the extent of resultant liver damage.  Some patients like Phelps are asymptomatic.  When the condition is acute, symptoms can include fatigue, loss of appetite, nausea, vomiting, diarrhea, muscle aches, and abdominal discomfort.  *Id*. ¶6.  Barrera explains that the policy of the Department of Public Safety and Correctional Services ("DPSCS")[6] provides that once an inmate tests positive for HCV the inmate is enrolled in chronic care supervision for HCV management. *Id*. ¶7.  A DPSCS panel composed of medical providers, mental health providers, pharmacists, and infectious disease specialists then considers and evaluates HCV treatment provided to the inmate. *Id. ¶* 8.

The policy provides that, due to potential side effects of HCV antiviral treatment, an inmate will not be considered for antiviral therapy if he or she is asymptomatic and demonstrates an undetectable viral load.  *Id. ¶*9.  Inmates who are eligible for antiviral therapy receive various blood tests and meet with a gastrointestinal or infectious disease specialist.  *Id*. ¶ 10.  If the inmate is eligible for antiviral treatment, various blood tests are performed and a consultation with a gastrointestinal or infectious disease specialist is arranged for all candidates for liver

---

[6]   A copy of the policy has not been filed in this case.  I take notice of the policy, however, because it was filed in *Insley v. Graham*, Civil Action No. ELH-16-1220 (D. Md.); ECF 13-4; 2016 WL 7157419 (December 8, 2016).

biopsy or antiviral therapy. *Id.* Inmates with HCV genotype 2 or 3, and HIV/HCV co-infected inmates, are not required to have a liver biopsy as a condition precedent to antiviral treatment. *Id*. For symptomatic HCV inmates with a detectable antiviral load, the antiviral therapy most often approved by the DPSCS is Pegylated Interferon/Ribarvirin. *Id.* ¶12. Since 2012, other antiviral treatment options, including Harvoni, have been approved for inmates by the DPSCS HCV panel, but only on a case by case basis. *Id*. ¶13. In February of 2016, as more alternative antiviral treatments became available, the DPSCS HCV panel began "systematically treating inmates with more advanced grade and stage levels of HCV and working down to less advanced grade and stage levels" according to priorities set in the HCV policy. *Id*.

On February 11, 2016, Dr Ashraf saw Phelps in the Chronic Care Clinic ("CCC"). He did not report any adverse symptoms related to HCV. Phelps denied experiencing fatigue, nausea, or vomiting. *Id*. ¶14. Ashraf noted on the medical report that Phelps's lab work was within normal limits. *Id*.; *see also* ECF 5-2 at 8. Phelps was counseled regarding a liver biopsy[7] and HCV disease management. *Id*.; *see also* ECF 5-2 at 9. On April 14, 2016, Phelps declined to attend a scheduled medical appointment with Dr. Ashraf. ECF 5-1, ¶15; *see also* ECF 5-2 at 30.

Krista Bilak, RNP, examined Phelps in the CCC on May 3, 2016. Bilak's record of the visit notes Phelps's HCV was "stable" and the severity level was "mild-moderate." ECF 5-2 at 39. Bilak recounted "Pertinent negatives" as to abdominal distension, abdominal pain, blood in stool, bruising, fever, jaundice, lethargy, melena,[8] nausea, pruritus, sleep pattern changes, sweats, chills, tremors, weight gain, and weight loss. She counseled Phelps related to his refusal of a

---

[7] It is unclear whether a liver biopsy was recommended or offered to Phelps at this visit.

[8] Melena is the passage of black, tarry stools. *See* https://www.ncbi.nlm.nih.gov/books/ NBK411/.

liver biopsy procedure[9] and scheduled Phelps for a chronic care appointment in three months. ECF 5-1, ¶16; *see also* ECF 5-2 at 39-40.

On July 21, 2016, when Bilak examined Phelps, she again noted "pertinent negatives" for abdominal distension, abdominal pain, blood in stool, bruising, fever, jaundice, lethargy, melena, nausea, pruritus, sleep pattern changes, sweats, chills, tremors, weight gain, and weight loss. ECF 5-1, ¶17; ECF 5-2 at 46. Bilak determined that, based on Phelps's lack of viral load and genotype, treatment for HCV was not indicated at that time. She scheduled an appointment for Phelps in three months. *Id.*; ECF 5-2 at 46-47.

Barrera avers that Phelps continues to be evaluated regularly for his HCV as a chronic care inmate. ECF 5-1, ¶20. He attests, *id.* ¶ 19:

> It is Affiant's opinion to a reasonable degree of medical probability that the treatment provided to Plaintiff for his HCV was appropriate and within the standard of care. As Plaintiff's HCV is asymptomatic, his lab work is within normal limits and his viral load is undetectable, Plaintiff is not a candidate for HCV treatment at this time, including Harvoni.

Phelps replied to the State response by filing a motion for summary judgment (ECF 8), supported by an Affidavit executed by inmate Donald Pevia (ECF 8 at 4) and a copy of a Request For Administrative Remedy. ECF 8-1 at 1-2. Phelps did not file his own Affidavit, however. In his motion for summary judgment, Phelps claims that Balik and Ashraf "neglected and lied" in regard to his complaints. Phelps maintains that he complained of complications due to the virus during both visits, but "both medical personal [sic] refused to report it." Further, Phelps alleges that his requests for medication to relieve HCV-related pain were erroneously documented on his medical chart as complaints of knee pain. ECF 8 at 2; *see also* ECF 5-2 at 2-3, 4-5, 8, 11-18, 23-28. 32-35, 50, 52- 66 (noting Phelps's complaints of knee pain). Phelps asks

---

[9] It is unclear whether Phelps was offered and refused a biopsy. Neither side directly addresses this question.

why the record before this court lacks documentation of his lab tests results.  He complains that he has never been given a liver biopsy to determine whether his liver is damaged by the HCV. ECF 8 at 3.

In his Affidavit, inmate Pevia avers that unnamed medical personnel told him that he was not a "priority" due to limited resources and could not be treated for HCV.[10]  Pevia states that Wexford treated him with Harvoni only after he filed a motion for emergency injunctive relief. ECF 8 at 4.

## II.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren.* 553 U.S. 674, 689-90 (2008)); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), vacated on other grounds and remanded, 559 U.S. 1089 (2010), reinstated in part, 607 F.3d 355 (4th Cir. 2010) (per curiam).  A preliminary injunction is a remedy that is "'granted only sparingly and in limited circumstances.'"  *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  All four

---

[10]  Donald Pevia is the plaintiff in *Pevia v. Wexford Health Sources, et al.,* Civil Action No. ELH-16-1950 (D. Md.).  The medical facts in Pevia's case are distinguishable from those presented here.  They have no bearing on the course of Phelps's medical treatment.

elements must be satisfied. *The Real Truth About Obama, Inc. v. Federal Election Commission,* 575 F.3d at 346 (4th Cir. 2009).

Phelps has not met his burden of satisfying all four elements required for the extraordinary relief contemplated by a motion for an emergency injunction.  Phelps's motion does not demonstrate the likelihood of success on the merits because he is not entitled to a particular course of medical treatment or to Harvoni, the treatment of his choice.  Moreover, the Medical Defendants refute Phelps's assertions that he is likely to suffer irreparable harm in the absence of preliminary relief.  Phelps's motion does not address whether the balance of equities tips in his favor or why an injunction would be in the public interest.  The record suggests no such reasons.

Accordingly, I shall deny the motion for preliminary injunctive relief (ECF 2).

### III.    Summary Judgment

### A.    Standard of Review

Phelps has filed a motion styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P.

12(d); *Adams Housing, LLC v. The City of Salisbury, Maryland*, ____ Fed. App'x ____, 2016 WL 695849, at *2 (4th Cir. Nov. 29, 2016) (per curiam).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."). However, when the movants expressly caption their motion "in the alternative" as one for summary judgment, and submit matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont DeNemours and Co. v. Kolan Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't. of Transporation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). Notably, "to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

Phelps has not filed an affidavit under Rule 56(d).  And, I am satisfied that it is appropriate to address both Phelps's motion and the motion filed by the Medical Defendants in the context of summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a).  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d

308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## B. Discussion

Phelps claims that defendants acted with deliberate indifference to his serious medical need by denying him treatment with Harvoni. ECF 1. He avers that this places him at risk of imminent and irreparable harm. ECF 3. The Medical Defendants assert there are no facts to indicate a claim for violation of Phelps's civil rights under 42 U.S.C. §1983, and that they are entitled to summary judgment as a matter of law.

As noted, suit was filed under 42 U.S.C.§ 1983. It provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . ." (Emphasis supplied).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219,

225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an

Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions

of the defendants or their failure to act amounted to deliberate indifference to a serious medical

need. *See Estelle v. Gamble*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir.

2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  The Fourth Circuit has characterized the

applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the

prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison

staff were aware of the need for medical attention but failed either to provide it or to ensure that

the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d

at 219.

As indicated, the medical condition at issue must be objectively serious.  A "'serious . . .

medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir.

1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to

a serious medical need, the inmate must show a "significant injury." *Danser*, 772 F.3d at 346 n.8.

Proof of an objectively serious medical condition does not end the inquiry. The subjective

component requires a determination as to whether the defendant acted with "a sufficiently

culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-

40; *Scinto*, 841 F.3d at 225.  Put another way, "[t]o show an Eighth Amendment violation, it is

not enough that an official *should* have known of a risk; he or she must have had actual

subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

"True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Of import here, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), resonates here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Further, with regard to medical care providers, "any negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

Even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (*overruled in part on other grounds by Farmer,* 511 U.S. at 837. And, of significance here, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

Hepatitis likely constitutes a serious medical need sufficient to satisfy the objective component of an Eighth Amendment analysis. *See, e.g., Owens v. Hutchinson*, 79 Fed. Appx. 159, 181 (6th Cir. 2003) (prison medical officials did not violate inmate's Eighth Amendment right to adequate medical care by failing to treat his Hepatitis C virus with Interferon and

Ribavirin).   But, the submissions fail to show conduct rising to the level of deliberate indifference.

The DPSCS policy regarding HCV infection control requires that all inmates testing positive for HCV must enroll in the Chronic Care Clinic, so they can be monitored and educated regarding their condition.   Phelps is seen in the CCC every three months for his HCV.   Blood panels are routinely taken and evaluated and reveal no undetectable viral load.   Individual treatments are considered for inmates diagnosed with HCV by a DPSCS Panel, comprised of health and mental health providers, pharmacists, and infectious disease specialists.   The Medical Defendants have shown that the primary HCV treatment approved for system-wide care is Pegylated Interferon/Ribavirin.

As numerous courts have acknowledged, HCV does not require treatment in all cases. *See, e.g., Johnson v. Wright*, 412 F.3d 398, 400 (2d Cir. 2005) ("New York State Department of Corrections [ ] policy generally forbids the prescription of hepatitis C medication to any prisoner with evidence of active substance abuse within the preceding two years."); *Iseley v. Dragovich*, 90 Fed.Appx. 577, 581 (3d Cir. 2004) ("Interferon treatment was contraindicated in [plaintiff's] case because his condition had not yet progressed to the point where such treatment would have been appropriate."); *Edmonds v. Robbins,* 67 Fed.Appx. 872, 873 (6th Cir. 2003).

To be sure, inmates have a constitutional right to adequate medical treatment.   But, they do enjoy the right to the treatment of their choice.   The fact that Phelps is not receiving Harvoni does not reflect deliberate indifference by the Medical Defendants.   As shown, Harvoni is not the drug of choice for the DPSCS.   Phelps is regularly monitored for his HCV and his test results continue to show an absence of viral load.   Further, Phelps has not refuted the information in his

verified medical records.   Phelps's disagreement with medical providers over whether he should be treated with Harvoni does not rise to the level of a constitutional violation.

In addition, Wexford, a contractual prison health care provider, argues that it may not be held liable under the theory of respondeat superior.

It is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

In *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), the Fourth Circuit set forth three elements that a plaintiff must prove to establish supervisory liability under § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*See also King*, 825 F.3d at 224 (applying the *Shaw* elements); *Armstrong v. City of Greensboro*, ___ F. Supp. 3d ___, 2016 WL 3167178, at *11 (M.D.N.C. June 6, 2016) (same); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015) (same), *aff'd*, 644 F. App'x 243 (4th Cir. 2016), *cert. denied*, ___ U.S. ___, 2016 WL 5874521 (Dec. 5, 2016).

According to the *Shaw* Court, to satisfy the first element, a plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a

pervasive and unreasonable risk of constitutional injury to the plaintiff." 13 F.3d at 799 (citing *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). And, establishing a "pervasive" and "unreasonable" risk of harm "requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799. Here, the record is devoid of any evidence indicating a pervasive or "widespread" problem in diagnosing and treating assault victims.

When, as here, the plaintiff points to no action or inaction on the part of a supervisory defendant that resulted in a constitutional injury, the claims against any supervisory personnel must be dismissed.

## IV.  Conclusion

Phelps's narrowly presented claim, in which he alleges deliberate indifference to his medical needs based on the Medical Defendants' failure to prescribe Harvoni, will be denied for the reasons discussed above.   For the reasons stated, I shall deny Phelps's motion for an emergency injunction (ECF 2) and his motion for summary judgment (ECF 8).    And, I shall grant the Medical Defendants' Motion for summary judgment (ECF 15).

I note, however, that if Phelps believes he is exhibiting worsening symptoms associated with HCV, and that he is generally receiving inadequate treatment in light of his recent symptoms, that issue is not presented or addressed here.   Phelps is free to file another § 1983 claim on that basis.  But, I express no opinion regarding the merits of such a claim.

The Clerk will be directed to send Phelps a §1983 information and forms packet to Phelps to assist him if he desires to pursue this or other claims.

A separate Order follows.

February 8, 2017_____
Date

_____/s/_____
Ellen L. Hollander
United States District Judge